IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

MISTY DAWN ROGERS                                                                    PLAINTIFF

          v.          Civil No. 10-3097

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                       DEFENDANT

**MEMORANDUM OPINION**

      Plaintiff, Misty Rogers, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for disability insurance benefits ("DIB") and supplemental insurance benefits ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background:**

      The plaintiff filed her applications for DIB and SSI on August 15, 2008, alleging an onset date of February 20, 2000, due to bilateral hearing loss, vertigo, asthma, chronic obstructive pulmonary disease ("COPD"), and back pain. Tr. 34, 39, 45-51, 160, 166-167, 191-192, 206. Her applications were initially denied and that denial was upheld upon reconsideration. Tr. 80-83. Plaintiff then made a request for a hearing by an Administrative Law Judge ("ALJ"). An administrative hearing was held November 19, 2009. Tr. 28-64. Plaintiff was present and represented by counsel.

      At this time, plaintiff was 36 years of age and possessed a high school education. Tr. 32. She had past relevant work ("PRW") experience as a certified nurse aid and leather belt maker. Tr. 34, 55-56, 147-154, 176-183, 208. Plaintiff testified that she had continued to work part-time as a CNA, until March 2009, when she began experiencing significant vertigo and back pain. Tr. 34.

      On May 4, 2010, the ALJ found that plaintiff's bilateral hearing loss, vertigo, and asthma were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P,

Regulation No. 4. Tr. 11-12. After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work requiring exposure to no more than moderate noise; no exposure to unprotected heights; no telephone usage; no climbing ladders, ropes, or scaffolds; no more than moderate exposure to airborne irritants including, but not limited to odors, fumes, and dust; no more than moderate exposure to unmanned machinery; and, no transactional interaction with the public. Tr. 12-13. With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a poultry eviscerator, production line assembler, and sewing machine operator. Tr. 14-15.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on September 3, 2010. Tr. 1-3. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF No. 9, 10.

## II. **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings

of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III. **Evidence Presented:**

Records dated prior to the relevant time period indicate that Plaintiff was treated for sinusitis, pharyngitis, bronchitis, allergies, left side facial paresthesia, cellulitis, pancreatitis, subacute cholecystitis and cholelithiasis, and low potassium. Tr. 244-252, 284-295. She also fell and injured her right wrist, although this does not seem to have resulted in a chronic condition. Tr. 244-252, 284-295.

On January 5, 2000, Dr. Claude Parrish treated Plaintiff for an upper respiratory infection. Tr. 243, 319. Her symptoms included a headache, congestion, and a cough. He prescribed Cephalexin. Tr. 243, 319.

On January 12, 2000, Plaintiff was diagnosed with sinusitis. Tr. 243, 319. Dr. Parrish prescribed Claritin D, a Z-pack, fluids, saline gargles, and a humidifier. Tr .243, 319.

On June 12, 2000, Plaintiff complained of left shoulder, neck, and right wrist pain after falling and striking a table. Tr. 253, 320. Dr. Parrish's examination showed bruising and swelling of the right inner wrist and a stiff left shoulder. She also had tenderness over her upper ribs and clavicle with a decreased range of motion. X-rays revealed no fracture to the wrist. Tr. 253, 320.

On May 15, 2001, Dr. Parrish prescribed Flonase, Cephalexin, and Diflucan to treat Plaintiff's sinusitis. Tr. 253.

On June 1, 2001, Plaintiff was evaluated by Dr. Lance Burrell, an audiologist. Tr. 209-210, 212. The exam revealed substantial conductive hearing loss on the left and a moderate to severe sloping sensorial loss on the right. Plaintiff also had congenitally small pinna (outer part of the ear) and external auditory canals. Dr. Burrell diagnosed Plaintiff with sensorial hearing loss with a slight conductive component on the right and mixed hearing loss on the left. He then referred her to Dr. Estrem. Tr. 209-210.

On July 2, 2001, Dr. Scott Estrem examined Plaintiff and diagnosed her with possible congenital fixation of the stapes. Tr. 210, 282. An examination showed three negative forks on the left and all positive forks on the right. Dr. Estrem ordered a CT scan and evaluation of the inner ear and ossicles. He also discussed the possibility of operating on her left ear to correct the conductive loss. Tr. 210, 282.

On November 26, 2001, Dr. Parrish treated Plaintiff for sinusitis. Tr. 320. He prescribed Flonase, Cephalexin, and Diflucan. Tr. 320.

On December 11, 2001, Plaintiff sought treatment for complaints of hoarseness, a cough, an ear ache, and a headache. Tr. 242, 318. Dr. Parrish diagnosed her with laryngitis and bronchitis. He prescribed Allegra, a cough suppressant with Codeine, and saline gargles. Tr. 242, 318.

On September 30, 2002, Dr. Pamela McGarrah treated Plaintiff for cerumen impaction secondary to an ear deformity and dizziness. Tr. 227, 271. She prescribed Meclizine. Tr. 227, 271.

On December 2, 2002, Plaintiff was again treated for sinusitis and bronchitis. Tr. 242, 318. Dr. Parrish prescribed Cephalexin and rest. Tr. 242, 318.

On April 11, 2003, Dr. Parrish diagnosed Plaintiff with sinusitis, pharyngitis, and an ear ache. Tr 254, 321. He prescribed Cephalexin and Sudafed. Tr. 254, 321.

On October 8, 2003, Plaintiff was again treated for cerumen impaction. Tr. 270.

On October 31, 2003, Plaintiff continued to experience problems with sinusitis. Tr. 254, 321. Dr. Parrish also noted decreased hearing in her left ear due to previous surgery. He prescribed Cephalexin, a cough syrup with Codeine, Allegra, and a humidifier. Tr. 254, 312.

On December 17, 2003, Plaintiff complained of a rapid heart rate. Tr. 241, 317. Dr. Parrish ordered an EKG, which was ultimately found to be within normal limits. He diagnosed her with a cardiac murmur with palpitations. Tr. 241, 317.

On December 18, 2003, Plaintiff underwent a Holter EKG. Tr. 274-277. It revealed a normal sinus rhythm, occasional premature ventricular contraction, rare premature atrial contraction, and no pauses. An echocardiogram was also conducted, showing normal dimensions, normal left and right ventricular performance, an ejection fraction rate of 60%, and mild tricuspid regurgitation. Tr. 279-281.

On December 30, 2003, Plaintiff was diagnosed with sinusitis and bronchitis. Tr. 241, 317. Dr. Parrish prescribed a Z-pack and an over-the-counter decongestant. Tr. 241. 317.

On February 11, 2004, Plaintiff was again treated for symptoms related to sinusitis. Tr. 255, 322. Her symptoms persisted through at least March 19, 2004. Tr. 255, 322.

On January 12, 2005, Plaintiff complained of heartburn. Tr. 240, 316. Dr. Parrish diagnosed her with GERD and prescribed Pepcid. He also referred her to Dr. Langston for an EGD. Tr. 240.

On January 18, 2005, Dr. Kim Olecke at the Lead Hill Clinic treated Plaintiff. Tr. 273. She noted Plaintiff's history of GERD symptoms with occasional water brash (regurgitation of saliva or gastric fluid). Dr. Olecke prescribed a trial of Nexium. If this did not work, she indicated that Plaintiff would undergo an upper endoscopy. Dr. Olecke also noted that Plaintiff owed her clinic $2500.00. Plaintiff was currently working and making payments to the hospital, but was not paying her clinic bill. Although Plaintiff indicated that she would make payments, Dr. Olecke doubted this would occur. Tr. 273.

On June 2, 2005, Plaintiff was treated for sinus congestion, a headache, and right ear pain. Tr. 240, 316. Dr. Parrish diagnosed her with sinusitis and prescribed Biaxin, Claritin, and Flonase. Tr. 24, 316.

On June 27, 2005, Dr. Parrish treated Plaintiff for allergic rhinitis. Tr. 240, 316. He switched her back to Claritin D. Tr. 240, 316.

On August 13, 2005, Plaintiff presented with complaints of chest congestion. Tr. 256, 323. Dr. Parrish noted right middle and lower lobe crackles. He diagnosed her with pneumonia, and prescribed Mucinex and Cipro. Tr. 256, 323.

On September 16, 2005, Plaintiff's pneumonia had improved. Tr. 256, 323. However, faint expiratory crackles were still evident in the left lower lobe. Tr. 256, 323.

On October 22, 2005, Dr. Parrish diagnosed Plaintiff with sinusitis, and prescribed Cephalexin. Tr. 256.

On February 14, 2006, Dr. Parrish treated Plaintiff for bronchitis and sinusitis. Tr. 239, 315. Dr. Parrish prescribed Cephalexin and advised her to continue Mucinex. Tr. 239, 315.

On February 20, 2007, Plaintiff was treated for cerumen impaction in her right ear. Tr. 257, 324.

6

On December 26, 2007, Plaintiff again complained of symptoms associated with sinusitis. Tr. 257. An examination revealed that her chest was clear. Dr. Parrish prescribed Amoxil. Tr. 257.

On March 21, 2008, Plaintiff was diagnosed with bronchitis. Tr. 257, 324. Dr. Parrish noted rhonchi scattered throughout her lungs. He administered a Rocephin injection and prescribed Flonase. Tr. 257, 324.

On March 24, 2008, Dr. Parrish noted that Plaintiff's bronchitis was resolving. Tr. 238, 314. However, she continued to experience congestion. Tr. 238.

On April 16, 2008, Plaintiff was again treated for congestion. Tr. 238, 314. Dr. Parrish gave her samples of Singulair. Tr. 238, 314.

On June 4, 2008, Plaintiff continued to experience congestion. Tr. 258, 325. Dr. Parrish administered DepoMedrol and Decadron injections. Tr. 258, 325. Her symptoms persisted and a second DepoMedrol injection was administered on June 6, 2008. Then on June 25, 2008, Dr. Parrish diagnosed her with sinusitis and prescribed a Z-pack. Tr. 258, 325.

On July 23, 2008, Dr. Parrish treated Plaintiff for heaviness in her chest, hoarseness, and a sore throat. Tr. 313. She also had decreased breath sounds. Dr. Parrish diagnosed her with asthma and provided her with samples of Symbicort. Tr. 313.

On September 17, 2008 , Dr. Michael McGhee noted Plaintiff's lifelong history of hearing loss and multiple external ear surgeries. Tr. 213-215. She complained of tinnitus, but no vertigo. An audiogram revealed asymmetric conductive hearing loss much worse on the left than the right. Her bilateral sensorineural hearing loss was moderate to severe. Dr. McGhee recommended further work up to assess the possibility of corrective surgery. However, he also noted that she would benefit from hearing amplification. Tr. 213-215.

On September 30, 2008, Dr. Parrish treated Plaintiff for problems with her right ear. Tr. 313. She said it felt as though she was in a tunnel. An examination revealed a swollen right canal. Dr. Parrish diagnosed Plaintiff with otitis externa and prescribed medications. Tr. 313.

On October 17, 2008, Plaintiff complained of left shoulder pain. Tr. 259, 326. She reportedly injured it while pulling herself up from a lying position. Dr. Parrish noted pain with passive range of motion and left clavicle pain on palpation. X-rays were within normal limits, so Dr. Parrish diagnosed her with shoulder strain. He prescribed Darvocet and Flexeril. Tr. 259, 326.

On January 8, 2009, Plaintiff presented in Dr. Parrish's office with complained of sharp, chronic right ear pain after blowing her nose. Tr. 305, 312. She also complained of dizziness and vertigo. Dr. Parrish diagnosed her with sinusitis, as her lungs were clear. He then administered Decadron, DepoMedrol, and Rocephin injections. Tr .305, 312.

On January 23, 2009, Plaintiff was again treated for sinusitis with ear pressure and back pain. Tr. 312. Dr. Parrish administered Rocephin, Decadron, and DepoMedrol injections. Tr. 312.

On February 17, 2009, Plaintiff complained of chest pressure, dry heaves, a cough, and sinus drainage. Tr. 306, 327. Dr. Parrish noted that she was very pale and clammy. Accordingly, he had her transferred to St. John's. Tr. 306, 327.

On March 10, 2009, Dr. Paul Neiss, an ear, nose, and throat specialist, evaluated Plaintiff. Tr. 301-303. Plaintiff reported bilateral progressive hearing loss, poor understanding of speech, bilateral tinnitus, and dizziness. Her symptoms were moderate and limited her activity "somewhat." Plaintiff indicated that she always felt a little imbalanced. She had a history of ear infections due to a pinna deformity. An examination revealed a normal neurological exam and a normal gait. Plaintiff did exhibit mixed hearing loss and tinnitus, benign paroxysmal positional vertigo, and a congenital ear deformity. Dr. Neiss recommended a hearing aid evaluation. He gave her the phone number for a vocational rehabilitation counselor to obtain assistance. Dr. Neiss also noted that Plaintiff would have trouble

working most jobs with her hearing loss. He ordered a videonystagomography ("VNG") to further evaluate her dizziness before clearing her for work. Tr. 301-303.

On March 24, 2009, Plaintiff underwent a VNG, which revealed a long standing lack of vestibular input and abnormal vestibulo-ocular response ("VOR"). Tr. 304. This indicated that she would experience difficulty walking in the dark or at dusk and walking on uneven surfaces. Tr. 304.

From March 26 until March 28, 2009, Plaintiff was admitted to St. John's Hospital after waking up during the night with severe shaking, chills, and indigestion. Tr. 331-424. She took Tylenol, antacids, and Prilosec before going back to bed. The next morning, Plaintiff awoke with similar symptoms. On the way to see her doctor, Plaintiff developed chest tightness. An examination revealed a normal range of motion in the neck, no musculoskeletal tenderness, and a normal mood and affect. A chest x-ray showed minimal right basilar atelctasis versus minimal peripheral right basilar atlectasis versus airspace disease. An EKG was within normal limits, while a CT scan revealed patchy ground glass infiltration within the right middle lobes along with fibrin inflammatory infiltrates. Plaintiff then underwent an echocardiogram, which revealed an ejection fraction rate of 50-55% with mild diastolic dysfunction and mild trivial tricuspid and pulmonary valvular regurgitation. Plaintiff was diagnosed with pneumonia. She was initially administered Levolfloxacin via IV. At the time of discharge, Plaintiff was given ten days of oral antibiotics and told to continue the Sudafed, Symbicort, Flonase, Tylenol, and Potassium. Tr. 331-424.

On March 30, 2009, Plaintiff reported a history of shortness of breath and chest pain radiating into her left upper extremity. Tr. 307, 311. She was transferred to St. John's. Tr. 307, 311.

On April 6, 2009, Plaintiff's lungs were clear, although she continued to exhibit diminished breath sounds. Tr. 307, 311. Dr. Parrish diagnosed her with status post pneumonia. He advised her to continue her current treatment and to repeat x-rays in six weeks. Tr 307, 311.

9

On April 17, 2009, Plaintiff was again treated for sinusitis. Tr. 308, 328. Dr. Parrish prescribed a Rocephin injection. Tr. 308, 328.

On August 12, 2009, Plaintiff returned to Dr. Parrish's office with complaints of fluid in her right ear. Tr. 308, 328. Dr. Parrish again diagnosed her with sinusitis and prescribed Rocephin and Decadron injections. Tr. 308, 328.

On December 7, 2009, Plaintiff complained of sinus related symptoms, back pain, and right shoulder pain. Tr. 329. An examination revealed pain to the right shoulder with both active and passive range of motion. Dr. Parrish diagnosed her with sinusitis and scapular pain. He ordered x-rays of her shoulder and noted that she requested a CT scan of her chest. Tr. 329.

On December 8, 2009, x-rays of Plaintiff's right shoulder and chest were normal. Tr. 309.

On December 23, 2009, a CT scan of Plaintiff's chest revealed complete resolution of pulmonary parenchymal capacity. Tr. 330, 425-430. Her lungs were clear. However, the scan also revealed a possible segmentation anomaly involving the upper thoracic spine which appeared to be congenital. Tr. 330, 425-430.

**IV.** **Discussion:**

Plaintiff contends that the ALJ erred in failing to properly evaluate her subjective complaints, finding her back impairment to be non-severe, and develop the record regarding listing 2.08. We will begin our analysis with an evaluation of Plaintiff's subjective complaints and the medical evidence of record.

    **A.** **Subjective Complaints:**

The ALJ was required to consider all the evidence relating to Plaintiff's subject complaints, including evidence presented by third parties that relates to: 1) Plaintiff's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitation and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and, 5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322

(8th Cir. 1984). The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

While an ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

At the onset, Plaintiff contends that the ALJ failed to apply the *Polaski* factors and provide specific reasons for discrediting her testimony. Although the ALJ never expressly cited *Polaski* (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. sections 404.1529 and 416.929, which largely mirror the *Polaski* factors. *See Randolph v. Barnhart,* 386 F.3d 835, 842 (8th Cir. 2004). Specifically, the ALJ found that Plaintiff had lived and worked with her hearing impairment for a very long time; could read lips and function well; had been advised that surgery and/or hearing aids would possibly help her condition; and, suffered from moderate vertigo that limited her ability to climb and perform other activities requiring balance. We conclude the ALJ adequately, if not expressly, applied the *Polaski* factors and discounted Plaintiff's subjective complaints of pain. *See, e.g., Goff*, 421 F.3d at 791-92.

      1.     **<u>Hearing Loss:</u>**

Records do reveal that Plaintiff suffered from congenital issues affecting both ears that impaired her hearing and resulted in chronic vertigo and balance issues. An audiological exam in 2001 demonstrated substantial conductive hearing loss on the left and a moderate to severe sloping sensorial loss on the right. Tr. 209-210, 212. Additional testing conducted in 2008 showed asymmetric

11

conductive hearing loss much worse on the left than the right with bilateral sensorineural hearing loss in the moderate to severe range. Tr. 213-215. At this time, the doctor indicated that Plaintiff would benefit from hearing amplification and recommended further work-up to assess her for possible corrective surgery. Tr. 213-215. In 2009, Dr. Paul Neiss conducted an evaluation of Plaintiff and diagnosed her with mixed hearing loss and tinnitus, benign paroxysmal positional vertigo, and a congenital ear deformity. Tr. 301-303. He, too, recommended a hearing aid evaluation and ordered a VNG, which indicated Plaintiff would experience difficulties walking at dark or dusk or on uneven surfaces, due to her vertigo. Tr. 304.

We note, as did the ALJ, that Plaintiff failed to follow-up regarding hearing aids and corrective surgery. Plaintiff contends that she did contact a rehabilitation counselor regarding assistance in obtaining hearing aids, but was told she had to be working in order to receive assistance. However, the vocational expert at the hearing testified that this information was incorrect. In fact, Plaintiff would be applicable to receive assistance in obtaining hearing aids and to obtain vocational assistance in obtaining employment following the placement of her hearing aids. Tr. 43. Therefore, we find no credible evidence showing that Claimant was denied treatment due to a lack of finances that would excuse her failure to pursue further evaluation regarding corrective measures. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir.1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).

It is also significant to note that Plaintiff worked, at least part-time, as a CNA until March 2009 in spite of her hearing loss, vertigo, and balance issues. Tr. 38. In fact, she testified that she quit work in March 2009 due to muscle spasms in her back and vertigo, not because of her hearing impairment.

*See Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) (holding that even part-time work is inconsistent with claim of disability).

### 2. Asthma/COPD:

Plaintiff was also treated for upper respiratory complaints, asthma/bronchitis, and pneumonia. Between January 2000 and December 2009, Plaintiff was treated for respiratory symptoms on at least 23 occasions. Generally, her symptoms were treated via antibiotics and decongestants. In August 2005, she was treated for pneumonia. Tr. 256, 323. In July 2008, Plaintiff was diagnosed with asthma. Tr. 313. Then, in March 2009, Plaintiff was hospitalized for two days due to pneumonia. Tr. 331-424. At that time, a chest x-ray showed minimal right basilar atelctasis versus minimal peripheral right basilar atlectasis versus airspace disease. Her symptoms were improved in April 2009, and by December 2009, a CT scan revealed complete resolution of her pneumonia. Tr. 330, 425-430.

Although we do note Plaintiff's extensive treatment for upper respiratory related symptoms, given the fact that her condition has required hospitalization on only one occasion, we can not say that the ALJ erred in failing to find her lung impairment to be disabling. Further, we agree with the ALJ's conclusion her impairment would interfere with her ability to work near airborne irritants such as odors, fumes, and dust.

### 3. Back Impairment:

Plaintiff contends that the ALJ erred in concluding that her back impairment was non-severe. She alleges that she suffers from back spasms that preclude her from performing the stooping, bending, and lifting activities required of a CNA.

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *See Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)). However ,alleged impairments may not be considered severe when they are stabilized by treatment and otherwise are generally unsupported by the medical record.

13

*Johnston v. Apfel,* 210 F.3d 870, 875 (8th Cir. 2000); see also *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000) (plaintiff bears the burden to establish severe impairments at step-two of the sequential evaluation).

Plaintiff stated that she became unable to work in March 2009, when her back pain began. Tr. 34-35. A review of the evidence, however, does not support Plaintiff's allegations of severe back pain beginning around this time frame. We note that Plaintiff complained of back pain on only two occasion in 2009: January and December. Tr. 322, 329. A CT scan of her chest, conducted in December 2009, revealed a possible segmentation anomaly involving the upper thoracic spine which appeared to be congenital. Tr. 330, 425-430. However, there were no x-rays or MRIs of Plaintiff's cervical, lumbar, or thoracic spine to substantiate these findings. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). There are also no physical examination findings to establish a limited range of motion, tenderness, pain, or discomfort in Plaintiff's back. *See Trenary v. Bowen*, 898F.2d 1361, 1364 (8th Cir. 1990) (holding mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis). And, there were no indications from Plaintiff's doctors that she would be unable to work due to this alleged pain. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's treating physicians opined the claimant was so impaired or disabled that the claimant could not work at any job).

The record also reveals that Plaintiff was prescribed only muscle relaxers and over-the-counter medications to treat her pain. *See Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) (fact that Plaintiff took over the counter medication for pain relief detracts from her claim); *see also Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). Given her limited complaints of pain, it appears these medications targeted her symptoms. *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)

AO72A
(Rev. 8/82)

(stating an impairment that can be controlled by treatment or medication is not considered disabling). Tr. 169-174. Accordingly, we find substantial evidence to support the ALJ's conclusion that Plaintiff's back impairment was not severe.

### 4. Other Impairments:

Records also reveal that Plaintiff was treated for shoulder pain and a cardiac murmur with palpitations during the relevant time. We note, however, that the medical evidence before the ALJ and currently before this Court does not indicate that these impairments were severe. . *See Forte*, 377 F.3d at 895. X-rays of her shoulder in December 2009 were unremarkable, as were two EKG's. Tr. 241, 309, 331-344. Her most recent echocardiogram also revealed an ejection fraction rate of 50-55% with mild diastolic dysfunction and mild trivial tricuspid and pulmonary valvular regurgitation. As such, we can not say that these impairments interfered with Plaintiff's ability to perform work-related activities. And, we note that Plaintiff does not contend that these impairments significantly limited her ability to perform work-related activities.

### 5. Activities of Daily Living:

Plaintiff's own reports concerning her daily activities also undermine her claim of disability. On August 28, 2008, Plaintiff completed an adult function report on which she reported taking care of her children, getting her children ready for school, getting herself ready for work, taking her children to school, getting her herself to work, and caring for her animals on a daily basis. Tr. 168-175. She also reported the ability to care for her personal hygiene, prepare meals, do all household chores (except climb to change a light bulb), walk, drive a car, ride in a car, shop in stores for groceries and necessities, pay bills, handle savings, use a checkbook/money orders, read, and go to school activities once or twice per week. Tr. 168-175. Further, she continued to work part-time as a CNA until March 2009. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit

AO72A
(Rev. 8/82)

neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, these are not the daily activities one would expect a disabled person to be able to perform.

  **B.** **<u>Listing 2.08</u>:**

Plaintiff also contends that the ALJ failed to conduct a meaningful review of the evidence with regard to the requirements of listing 2.08, relying instead on a conclusory statement that she did not meet the listing requirements. She also contends that the ALJ had insufficient medical evidence to determine whether she met the listing, given that the medical evidence of record did not mention the listing requirements.

To qualify for disability under a listing, a claimant carries the burden of establishing that her condition meets or equals all the specified medical criteria. *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995). Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 2.08 for hearing impairments requires that the Plaintiff exhibit an "average hearing threshold sensitivity for air conduction of 90 decibels or greater and for bone conduction to corresponding maximal levels, in the better ear, determined by the simple average of hearing threshold levels at 500, 1000, and 2000 hz" or "[s]peech discrimination scores of 40 percent or less in the better ear." 20 CFR Part 404, Subpart P, Appendix 1 § 2.08. However, the listing also requires that the Plaintiff's hearing not be restorable by hearing aid. *Id*. While it is true that the record does not contain

16

medical evidence that specifically addresses her impairment in comparison to the listing requirements, it does appear that Plaintiff's threshold hearing levels did not meet the requirements of the listing. Tr. 212, 215. We also note that doctors indicated that Plaintiff would benefit from hearing aids.

Additional surgery was also an option for Plaintiff. Perhaps the most damaging, however, is the fact that Plaintiff was able to work with her alleged hearing impairments for years. *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005) (holding absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work); *see also Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) (holding that even part-time work is inconsistent with claim of disability). And, when Plaintiff finally stopped working in March 2009, she did so due to back pain and vertigo, rather than hearing limitations. Accordingly, we can not say that the ALJ erred in concluding that Plaintiff's hearing impairment was not disabling.

### C. The ALJ's RFC Assessment:

We next examine the ALJ's RFC assessment. The ALJ concluded Plaintiff could perform a range of light work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or his RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

17

The ALJ properly considered Plaintiff's subjective complaints, the objective medical evidence, and the RFC assessment of the non-examining, consultative doctor. On October 30, 2008, Dr. David Hicks, a non-examining, consultative physician completed a physical RFC assessment. Tr .218-225. After reviewing Plaintiff's medical records, he found no exertional, postural, manipulative, visual, or environmental limitations. Only hearing limitations were noted. Tr. 218-225.

The undersigned is cognizant of Dr. Weiss' notation that Plaintiff would have difficulty working most jobs with her hearing impairment. Tr. 301-303. I also note the results of the VGN that revealed limitations regarding walking after dark, at dusk, or on uneven surfaces due to her vertigo. Tr. 304.

Given the fact that Plaintiff suffered from vertigo and balance issues that would impact her ability to perform the exertional requirements (standing and walking) of various levels of work and her respiratory impairment, we find substantial evidence to support the ALJ's finding Plaintiff could perform light work. Likewise, substantial evidence supports the conclusion that Plaintiff would be able to have exposure to no more than moderate level noise; no exposure to unprotected heights; no telephone usage; no climbing ladders, ropes, or scaffolds; no more than moderate exposure to airborne irritants including, but not limited to odors, fumes, and dust; no more than moderate exposure to unmanned machinery; and, no transactional interaction with the public.

### D. Vocational Expert's Testimony:

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert testified that a person of plaintiff's age, education, and work background with the above RFC, could still perform work as a poultry eviscerator, production line assembler, and sewing machine operator. Tr. 58-64. The Court believes the hypothetical questions the ALJ posed to the VE fully set forth the impairments which the ALJ accepted and which were supported by the record as a whole. *See Goff*, 421 F.3d at 794. According the Court believes that the VE's response to these hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a poultry eviscerator, production line assembler, and sewing machine operator. *See Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

**V.   Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 6th day of March 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)